Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Mark J. Ackley
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:   (208) 331-5525

Attorneys for Defendant
SCOTT ARLIS THOMAS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE B. LYNN WINMILL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR16-162-S-BLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM IN SUPPORT |
| vs. | ) | OF MOTION TO SUPPRESS |
| | ) | EVIDENCE DERIVED FROM AN |
| SCOTT ARLIS THOMAS, | ) | UNLAWFUL SEARCH AND |
| | ) | SEIZURE |
| Defendant. | ) | |
| | ) | |

SCOTT ARLIS THOMAS, by and through his attorney, Mark J. Ackley, for the

Federal Defender Services of Idaho, respectfully submits this memorandum in support of

his motion to suppress and his request for an evidentiary hearing and oral argument.

# I. RELEVANT FACTS[1]

A.    Mr. Thomas's Parole Conditions and Residential History

On August 28, 2014, the Idaho Commission of Pardons and Parole ("Pardons and Parole") granted Scott Thomas parole on sentences imposed for convictions involving the manufacture and possession with the intent to deliver methamphetamine.    Exhibit A. Mr. Thomas's parole was subject to various conditions, including the following:

> Parolee is fully advised that written permission is required for the following: . . . (b) willfully changing residence[.]
>
> Parolee will submit to a search of person or property, to include residence and vehicle, at any time and place by any agent of Field and Community Services and s/he does waive constitutional right to be free from such searching.

*Id.*    During the course of Mr. Thomas's release on parole, he first resided at 3408 S. Ohio, Caldwell, Idaho; that residence was verified by Pardons and Parole on August 28, 2014. Exhibit B.    Mr. Thomas then moved to 2615 Colorado Ave, Caldwell, Idaho ("Colorado"); that residence was verified on September 26, 2014.    *Id.*    Finally, Mr. Thomas moved to 16965 Ten Lane, Nampa, Idaho ("Ten Lane"); that residence was verified on April 7, 2016.    *Id.*; *see also* Exhibit C.    From April 20, 2015, to the time of his arrest on May 13, 2016, Mr. Thomas resided with his wife, Monique Thomas.

---

[1]  The relevant facts are based in part upon police reports and audio/video recordings provided by the government in discovery.  Mr. Thomas does not concede the veracity of the information contained in the reports or the completeness of the recordings.  Mr. Thomas reserves the right to challenge the government's version of facts in his reply to the government's response, at any evidentiary hearing, and at any trial.

Figure 1 Exhibit D, Mr. Thomas's residence at Ten Lane



Pardons and Parole Officer ("PPO") Daniel Geisel supervised Mr. Thomas during the majority of his release.   On occasion, PPO Geisel conducted unannounced home visits.   Given the lack of notice, and the fact that he maintained consistent employment throughout his parole, Mr. Thomas was not always present for the unannounced visits.   *Id.* For example, on December 31, 2015, Mr. Thomas was not present at his Colorado address. Similarly, on April 21, 2016, Mr. Thomas was not present at his Ten Lane address.   *Id.*

B.     The Devils Diciples Motorcycle Club

Mr. Thomas is a member of the Idaho chapter of the Devils Diciples Motorcycle Club ("DDMC").   Exhibits F; G.   Membership in the motorcycle club is not precluded by the conditions of Mr. Thomas's parole.   *See generally* Exhibit A.   In fact, PPO Geisel was aware of Mr. Thomas's role in, and activities with, the DDMC, such as their charity motorcycle rides.   Exhibit E [2], Matthews at 00:13:40-00:13:57; *see also* Exhibit H (advertising the charitable event organized and sponsored by the DDMC).   However, PPO Geisel warned Mr. Thomas that wearing his DDMC vest would draw the attention of law

---

[2] Exhibit E contains multiple audios and audio-videos and will be filed separately with the Court and furthermore, due to the nature of its content, will also be filed under seal.

enforcement.   Exhibit B.   In fact, on January 12, 2016, Mr. Thomas was stopped by police while wearing his vest.   *Id.*   On that day, law enforcement determined that he had not committed any violations of his parole (traffic violations or otherwise), allowed him to keep his vest, and let him go.   *Id.*   When PPO Geisel learned of the traffic stop, he neither confiscated the vest nor identified wearing it as a violation of parole.   *Id.*

C.   The Treasure Valley Metro Violent Crimes and Gang Task Force

*No man can serve two masters.*

~ Matthew 6:24

PPO Geisel is a Task Force Officer ("TFO") for the Treasure Valley Metro Violent Crimes and Gang Task Force ("Task Force").   Exhibits I; J.   The Task Force consists of officers from a network of nine agencies in the Treasure Valley, including the FBI, the Caldwell Police Department, and Pardons and Parole.   Exhibit K.   Task Force officers work together to serve a well-defined mission:   to target for prosecution criminal enterprises responsible for drug trafficking and gang activity.   *Id.*   This mission can at times conflict with the mission of parole agents who, "in contrast to police officers, are not 'engaged in the often competitive enterprise of ferreting out crime,'" and whose "relationship with parolees is more supervisory than adversarial."   *Pa. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 368 (1998) (quoting *United States v. Leon*, 468 U.S. 897 (1984)).   Any conflict arising between missions must be resolved in favor of the Task Force.   As stated by Task Force leadership, "The Bible contains an adage that a person cannot serve two masters—[TFOs] have to be free from their parent organizations to build

Memorandum In Support Of Motion To Suppress     4

a new team, and colocation builds teamwork." <u>Exhibit K</u>.   The Task Force has targeted motorcycle clubs for criminal investigation and prosecution, including the DDMC.

On December 28, 2015, the Task Force informed TFO Geisel[3] that Mr. Thomas was an active member of the DDMC.   <u>Exhibit B</u>.   TFO Geisel organized an unannounced search of Mr. Thomas's residence. *Id.*   On January 14, 2016, TFO Geisel, accompanied by other TFOs, conducted "a very thorough search" of Mr. Thomas's residence at the Colorado address.   *Id.*   While "nothing significant [was] found," the Task Force questioned Mr. Thomas about his role as president of the DDMC and encouraged him to cooperate in their investigation of motorcycle clubs.[4]   Mr. Thomas declined.   Law enforcement never told Mr. Thomas that his association with the DDMC was a violation of his parole, and he was allowed to keep his DDMC vest.   On April 21, 2016, TFO Geisel and other Task Force members again attempted to conduct a search of Mr. Thomas's residence, this time after he had moved to his Ten Lane address; however, Mr. Thomas was not home at that time.   <u>Exhibit L</u>.

D.    <u>The Search of the DDMC Clubhouse</u>

There is a building located at 204 West Main Street in Caldwell, Idaho.   As of May 13, 2016, that building was leased by two tenants.   Jacob Quick, a member of the DDMC,

---

[3] To avoid confusion and to reflect reality, PPO Geisel will be referred as TFO Geisel throughout the remainder of this memorandum and all future proceedings.

[4] The Task Force did not record or otherwise document this contact.   These factual assertions are necessarily based in part on an email sent by the government acknowledging the nature and scope of this contact in response to an informal request for discovery.

rented the main floor of the building, accessed by a back door entrance, and referenced herein as the DDMC clubhouse.   Exhibit E, Matthews at 00:11:42 (identifying Mr. Quick as the lessee).   The other tenant ("Nate"), an owner of a hot tub business, rented the basement, accessed by a front door entrance.

Figure 2 Front and back entrances as the building located at 204 Main Street

 

On May 13, 2016, Mr. Thomas, Mr. Quick, and Brandon Rambow were gearing up for the charity ride and made a brief stop at the clubhouse to pick up an extra helmet.   The group was confronted by Nate, who accused them of damaging his property while clearing the area at the request of the property manager.   *Id.,* Gallup at 00:02:03-00:05:54. Nobody made any threatening statements or gestures.   *Id.* at 00:05:35-00:05:54; Matthews at 00:06:51-00:08:20.   Nate's wife called 911 and falsely reported that a "motorcycle gang" was destroying her property and "murdering" her husband.   Exhibits M; N; O; P.   The 911 call itself raised questions about the legitimacy of the report. Exhibit E, 911 Dispatch Call.   Officers from the Caldwell Police Department responded to the scene.   *Id.*   It immediately became clear that the report was, at a minimum, grossly exaggerated.   Exhibit E, Gallup at 00:00:28-00:00:38.   Thus, as Officer Joshua Gallup approached Nate and his wife, he casually inquired, "Are you being murdered," to which

Nate simply responded, "No."   *Id.*   Nate informed Officer Gallup that he had hot tubs in the back of the building that had been damaged by a motorcycle club when they cleared the area.

Figure 3 Response to 911 call:   "Are you being murdered?"



Law enforcement walked to the back of the building, readily located Mr. Thomas and his friends, and spent approximately four minutes questioning them about the incident.   *Id.* at 00:02:03-00:05:54.   The group informed law enforcement that the cement slab in the back of the building had been cleared at the property manager's request in anticipation of a charity motorcycle ride the following day.   *Id.*   All three cooperated, demonstrated respect, and remained calm.   *Id.*   Officer Gallup then spoke a second time to Nate, who confirmed the group's version of events.   *Id.* at 00:07:33-00:08:28.   Finally, Officer Gallup spoke to James, the property manager, who also corroborated the group's version of events.   *Id.* at 00:08:39-00:09:54.   Officer Gallup concluded that no criminal conduct had occurred.   *Id.* at 00:09:54-00:10:56; 00:12:13-12:50 ("So the long and short of it, sounds like it's a civil dispute. . . . These guys are fine.").   The time was 12:02 p.m.   *Id.*

As Officer Gallup concluded his investigation of the 911 call, Officer Randy Deleon

Memorandum In Support Of Motion To Suppress     7

asked Mr. Thomas if he was on felony supervision.    *Id.*, Matthews at 00:08:40.    When

Mr. Thomas confirmed his status, law enforcement searched him and frisked Mr. Quick

and Mr. Rambow, justifying the searches based on Mr. Thomas's status as a parolee and a

concern for weapons, respectively.    *Id.* at 00:08:41-00:09:21.    Law enforcement found

no evidence of criminal conduct or parole violations.    The time was 12:03 p.m.

　　　　After the 911 call investigation had concluded, Lieutenant ("Lt.") Joey Hoadley

asked Mr. Thomas whether it was a violation of his parole to hang out with the DDMC.

*Id.* at 00:10:04-00:10:11.    Mr. Thomas indicated that it was not, and that his parole officer

and the FBI knew he was active with the DDMC.    *Id.* at 00:11:19-00:11:37.    Lt. Hoadley

asked if TFO Geisel knew that Mr. Thomas was "hanging out" at the clubhouse, to which

Mr. Thomas responded that they were not doing anything wrong and had just come by to

pick up a helmet.    *Id.* at 00:11:20-00:11:37.    Without requesting permission, Lt. Hoadley

attempted to open the clubhouse door.    *Id.* at 00:11:37-00:11:43.    It was locked.    *Id.*

Lt. Hoadley asked Mr. Quick to open the door.    *Id.* at 00:11:56-00:11:59 ("Can you open

it to show us nobody else is inside?    I need to make sure there are no parole violations.")

Mr. Quick indicated that there was nobody inside, that there were no violations, and that

he must have locked himself out.    *Id.* at 00:12:00-00:12:09.    Lt. Hoadley became

agitated, turned his attention back to Mr. Thomas and exclaimed, "See how this starts to

look when you're on felony probation."    *Id.* at 00:12:10-00:12:19.    Lt. Hoadley's next

question:    "How is your UA going to look today?"    *Id.* at 00:12:20.    Mr. Thomas said

it would be fine.    *Id.* at 00:12:23.    Lt. Hoadley then departed to contact Pardons and

Parole.   *Id.* at 00:12:25.   The time was 12:05 p.m.

Lt. Hoadley contacted PPO Matt Thomas who acts as "the liaison with the Metro Task Force."   *Id.* at 00:25:55-00:26:01.   Lt. Hoadley informed him that he had made contact with Mr. Thomas while responding to a 911 call of "murder in progress" and that Mr. Thomas was wearing a DDMC vest.   <u>Exhibit Q</u>.   Given the severity of the 911 call and his belief that the DDMC was an outlaw motorcycle gang, PPO Thomas asked law enforcement to continue to detain Mr. Thomas and await his arrival.   *Id.*

Law enforcement kept their position around Mr. Thomas, repeatedly asked him whether he had used illegal drugs (which he denied), <u>Exhibit E</u>, Matthews at 0012:58-00:13:30 and 00:25:18-00:25:55; questioned him about patches on his vest (which he answered), *id.* at 00:19:05-00:19:38; accused the group of intimidating the community (which they denied), *id.* at 00:20:15-00:24:28; and claimed that they locked the door to keep them out of the clubhouse (which they denied), 00:24:28-00:24:44.   Lt. Hoadley even suggested that they had murdered someone and hidden the body inside the clubhouse. *Id.* at 00:26:30-00:26:35 (Mr. Quick: "We didn't murder anybody."   Lt. Hoadley:   "I wouldn't know because the door is locked.")).   As stated by Officer Matthews: "You guys think you're getting special attention, you are."   *Id.* at 00:24:45-00:24:47.

Figure 4   "You guys think you're getting special attention, you are."



At approximately 12:19 p.m., Officer Randy Deleon took Mr. Thomas's helmet, keys, and DDMC vest (against his wishes), while Lt. Hoadley escorted Mr. Thomas (by the arm) to the front of the building; other officers remained in the back with Mr. Quick and Mr. Rambow.   *Id.* at 00:26:58-00:27:28.   Once Mr. Thomas was isolated from his friends, Lt. Hoadley began admonishing him, alleging that he had not been cooperative and threatening, "You want attention. You got attention now homeboy. This place is going to be hot."   *Id.* at 00:28:01-00:28:24.   Thereafter, Officer Matthews, in conjunction with Lt. Hoadley and Officer Deleon, increased the pressure on Mr. Thomas by mocking him and his membership in the DDMC, accusing him of using methamphetamine, inspecting his arms and nose, calling him a liar, and falsely claiming that he had already admitted to using drugs.   *Id.* at 00:28:44-00:32:42.

Figure 5 "You want attention.   You got attention now homeboy."



After being asked one more time, Mr. Thomas admitted for the first time that he had used

methamphetamine a couple days earlier.   *Id.* at 00:32:45-00:33:05.

PPO Matthew Thomas (aka "the Metro Task Force liaison") arrived at approximately 12:26 p.m., and after a brief discussion with law enforcement and Mr. Thomas, called TFO Geisel to the scene.   *Id.* at 00:33:48; Exhibit Q.   Thereafter, law enforcement continued to press Mr. Thomas with leading and accusatory questions about using drugs and his activities at the club.   Exhibit E, Matthews at 00:34:38-00:44:44. After approximately ten minutes, Mr. Thomas stated:   "I'm done talking to you guys, please."   *Id.* at 00:44:44.   Nevertheless, law enforcement pressed on, claiming (based on the debunked 911 call) that Mr. Thomas was terrorizing people by yelling at people when wearing his vest.   *Id.* at 00:44:45 -00:46:51.   Mr. Thomas stated that he felt he was being harassed, to which Officer Matthews responded, "Welcome to our world, you don't think we get harassed every day?"   *Id.* at 00:49:15-00:49:32.   Officer Matthews told Mr. Thomas that he was receiving this type of attention because he wore a DDMC vest.   *Id.* at 00:49:32-00:50:31.

TFO Geisel arrived at approximately 12:45 p.m.   *Id.* at 00:52:06.   Law enforcement repeatedly interrupted Mr. Thomas as he was explaining events to TFO Geisel and Officer Adam Matthews even misstated events that had transpired, e.g., claiming that the group locked the door when Lt. Hoadley asked to enter the clubhouse.   *Id.* at 00:52:06-00:55:20.   Within minutes, TFO Geisel told Mr. Thomas to show him around the clubhouse.   *Id.* at 00:56:32-00:56:36.   Mr. Thomas responded that he did not live there. *Id.* at 00:56:37-00:56:43; 1:00:30-1:00:34.   TFO Geisel responded by threatening him,

stating, "You want to be out today, you better find a way in," and "Get in the building or you're going to jail." *Id.* at 00:58:18-00:58:49.   Mr. Thomas responded that Mr. Quick was is in charge of the building.   *Id.*   TFO Geisel turned to Mr. Quick (the leaseholder), stating, "He is on parole.   We have to understand what he is doing here.   He needs to get in this building or he is going to jail on a parole violation.   It's your guys' choice."   *Id.* at 00:58:52-00:59:08.   Officer Matthews asked whether Mr. Thomas had any personal property in the clubhouse to which Mr. Thomas indicated that he had some tools for working on the bikes.   *Id.* at 01:00:38-01:00:52.   Officer Matthews then advised Mr. Quick that unless they got inside the building, Mr. Thomas would spend ten years in prison. *Id.* at 01:01:17-01:01:47; 01:13:40-01:14:20.   When Mr. Quick began to walk to the front of the building (ostensibly to get keys from the property manager), law enforcement told him to stay put.   *Id.* at 01:03:03-01:03:21.   Later, when Mr. Quick started to make a phone call, law enforcement asked him not to use his phone.   *Id.* at 01:05:35-01:05:41; 01:06:45-01:07:03.

Law enforcement eventually located Mr. Thomas's keys in the same location they had placed them earlier, i.e., on one of their patrol cars.   *Id.* at 00:30:10-00:30:23; 01:05:45-01:06:10.   Mr. Thomas indicated that none of his keys would not fit the clubhouse door; a fact confirmed by law enforcement.   *Id*.   TFO Geisel told Mr. Quick that either Mr. Quick (as the leaseholder) could kick in the door or that Mr. Thomas was going to jail.   *Id.* at 01:06:02-01:06:16.   Mr. Quick said that he was too small, but Mr. Thomas's parole officers could try.   *Id.* at 01:14:30; 01:17:25.   However, Mr. Quick

Memorandum In Support Of Motion To Suppress     12

refused to sign a consent form permitted them to kick the door in or pick the lock.   *Id.* at 01:30:30- 01:30:50.

Figure 6 Mr. Thomas's keys did not fit the door.



As law enforcement continued to try to figure out a way inside the clubhouse, TFO Geisel contacted additional members of the Task Force.   Exhibit I.   When TFO Anthony Ostrander arrived, the two Task Force officers (Geisel and Ostrander) led Mr. Thomas outside the effective range of law enforcement's recording devices.   Exhibit E, Matthews at 01:19:40.   At some unidentified point, TFO Geisel made observations that apparently led him to believe that Mr. Thomas was residing at the clubhouse.   Exhibit G.   These observations included seeing a dog, a second vehicle, and a trailer and camper in the parking area that TFO Geisel had previously seen at Mr. Thomas's Colorado address.   *Id.*

At approximately 1:22 p.m., Officer Hoeksema arrived at the scene and picked the lock on the clubhouse door.   Exhibit E, Matthews at 01:31:29.   TFO Geisel, along with TFO Ostrander and PPO Thomas[5], took Mr. Thomas into the clubhouse to conduct a

[5] Lt. Hoadley referred to Matthew Thomas as the liaison for the Task Force, until more information is discovered, he will be referenced herein as PPO Thomas.

search.   *Id.* at 01:31:50.   PPO Thomas located a rifle in a small bedroom.   *Id.* at 01:39:18.   Law enforcement questioned Mr. Thomas about his access to the room where the firearm was found.   *Id.* at 01:39:18-01:41:15.   Mr. Thomas agreed that he had previously been in that room.   *Id.*

Three additional members of the Task Force (i.e., Doug Hart, Ryan Seely and Ryan Bonner) arrived to conduct a more extensive search of the clubhouse and interrogation of Mr. Thomas.   Exhibits J; R.   As TFO Seely was questioning Mr. Thomas, TFO Doug Hart located a small quantity of methamphetamine inside of a toolbox.   Exhibit S.   TFO Seely's report (prepared a month later) states that, during his unrecorded interrogation, Mr. Thomas admitted to occasionally spending the night at the clubhouse, admitted to having access or control over the toolbox, and admitted to knowing about the firearm.   *Id.*   At approximately 4:06 p.m., Mr. Thomas was formally placed under arrest and transported to the Canyon County Jail.   Exhibit T.   At no time was Mr. Thomas provided his *Miranda* warnings.

On May 16, 2016, TFO Ostrander interviewed Mr. Thomas at the Canyon County Jail.   Exhibit E (Interview Thomas).   TFO Ostrander told Mr. Thomas that TFO Seely "[was] not going to f*** you, if you don't f*** us."   *Id.* at 00:27.   TFO Ostrander read Mr. Thomas his *Miranda* rights.   *Id.* at 02:21-02:53.   Thereafter, TFO Ostrander asked Mr. Thomas to repeat in part what he previously told TFO Geisel, including that he admitted to being the president of the DDMC to using methamphetamine a couple days before his arrest.   *Id.* at 05:25-06:32; 27:32-29:24.

Memorandum In Support Of Motion To Suppress     14

## II. ARGUMENT

All evidence derived from law enforcement's warrantless and harassing search of the clubhouse, their prolonged detention of Mr. Thomas prior to that search, and their elicitation of his involuntary and unwarned statements should be suppressed.

A. Law Enforcement Conducted A Warrantless and Harassing Search In Violation Of The Fourth Amendment.

Warrantless searches are per se unreasonable and the exceptions to the warrant requirement are "jealously and carefully drawn." *Jones v. United States*, 357 U.S. 493, 499 (1958). The government bears the burden of proving an exception to the warrant requirement. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001). Although the government bears the burden of proving an exception to the warrant requirement, Mr. Thomas will briefly address various exceptions in anticipation of the government's potential response.[6]

1. Law enforcement could not rely on the parole search condition because they lacked probable cause that Mr. Thomas resided at the clubhouse.

A parole condition permitting searches of a parolee's residence is triggered only when officers have probable cause that the parolee lives at the residence to be searched. *United States v. Grandberry*, 730 F.3d 968 (9th Cir. 2013). This "is a relatively stringent standard which requires more than a mere well-founded suspicion. There must be strong evidence that the parolee resides at the address." *Id.* at 976 (brackets, citations and

---

[6] By addressing these anticipated arguments, Mr. Thomas does not waive his right to present additional evidence and briefing in reply to any exception relied upon by the government.

internal quotation marks omitted).   It is not enough that the parolee "happens to be seen" there, *United States v. Franklin*, 603 F.3d 652, 657 (9th Cir. 2010), that the parolee answers the door in boxer shorts, *Watts v. County of Sacramento*, 256 F.3d 886, 890 (9th Cir. 2001), or even that the parolee visits or spends the occasional night at the residence, *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006).   In assessing the totality of the facts relating to a probable cause determination, officers "should pursue reasonable avenues of investigation and may not close their eyes to facts that would clarify the situation."   *Ewing v. City of Stockton*, 588 F.3d 1218, 1227 (9th Cir. 2009) (quotations and citations omitted); *see also United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) ("[The police] may not disregard facts tending to dissipate probable cause." (internal quotations omitted)).

The weaknesses in the government's anticipated reliance on the parole search condition are highlighted by comparison to the Ninth circuit's decision in *Grandberry*.   In that case, a detective received information that the defendant was selling crack cocaine out of a garage.   *Grandberry*, 730 F.3d at 971.   Officers observed the defendant engaged in an apparent drug transaction at that location.   *Id.*   Further surveillance revealed that the defendant often drove back and forth between the garage and an apartment building on Arlington Avenue.   *Id.*   Over a ten-day period, officers observed the defendant enter the Arlington Avenue apartment building several times, typically with keys and on his own. *Id.*   The defendant was on parole with a condition that his residence could be searched without a warrant; however, the defendant had previously reported his residence at another location, i.e., 10652 South Manhattan Place.   *Id.* at 971-72.   The officers conducted

surveillance at the Manhattan Place address for about an hour but did not see the defendant. *Id.* at 972.   The officers did not interview anyone at the house or any neighbors because they did not want to reveal their continuing investigation.   *Id.*   The officers attempted to arrest the defendant as he walked toward the entrance to the Arlington Avenue apartment building.   *Id.*   The defendant ran away and tossed his keys to the ground.   *Id.*   After catching him, the officers searched the apartment.   *Id.*

The defendant moved to suppress on the ground that the officers lacked probable cause that he resided at the Arlington Avenue address.   *Id.* at 973.   The district court granted the defendant's motion.   *Id.*   Affirming the district court, the Ninth Circuit ruled that the "probable-cause-as-to-residence requirement" is a "precondition for a search pursuant to a parole condition."   *Id.*   The court articulated four factors which, viewed cumulatively, may present sufficient circumstances for establishing probable cause:   (1) the parolee does not appear to be residing at any address other than the address searched; (2) the officers "directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base"; (3) the parolee had a key to the residence searched; and (4) either the parolee's co-resident or the parolee identified the residence searched as that of the parolee.   *Id.* at 976.

As to the first factor, the court ruled that the officers' effort to confirm Grandberry's reported address was "perfunctory" and otherwise insufficient, especially in light of the fact that the defendant had consistently reported his home address.   *Id.* at 977-79. Regarding the second and third factors, the defendant's possession of a key and repeated

presence at the Arlington Avenue address were entitled to some weight but, without more, were not enough to establish probable cause.   *Id.* at 979-80.   Finally, neither the defendant nor any co-resident identified the apartment as his residence.   *Id.*

In this case, the four factors, in conjunction with the totality of the circumstances, demonstrate that law enforcement's observations were insufficient to lead a reasonably prudent person to believe that Mr. Thomas lived at the clubhouse.   As to the first factor, there was evidence that Mr. Thomas was living at another residence, i.e., the Ten Lane address that TFO Geisel had verified just a few weeks earlier.   TFO Geisel documented a single occasion, i.e., an unannounced search, when Mr. Thomas was not present at the Ten Lane address.   On that occasion, TFO Geisel likely spent a matter of minutes before moving to the next parolee's house.   This represents even less than the "perfunctory" one-hour surveillance effort that the Ninth Circuit found insufficient in *Grandberry*.   *Id.* at 978.   Further, Mr. Thomas had consistently reported an accurate change of residence while on parole.   Exhibits B; C.   Thus, there was substantial reason to believe he lived at the Ten Lane address, even if he happened to be gone during an unannounced search as he had on occasion at his prior Colorado address.   Exhibit B.

Regarding the second factor, TFO Geisel observed a dog, a second vehicle, and a trailer and camper in the clubhouse lot that he had previously observed at Mr. Thomas's Colorado address.   While the presence of those items demonstrated the uncontroverted fact that Mr. Thomas was associated with the DDMC clubhouse, they did not approach "strong evidence" that he *lived* there.   *Id.* at 976 (internal quotations omitted).

Moreover, TFO Geisel did not determine how long those items had been there or whether there was a reasonable explanation for their presence other than the one that he chose to adopt.   Indeed, based on his report, it appears that TFO Geisel never asked Mr. Thomas about his observations and conclusions.   Exhibit G.

The third and fourth factors weigh heavily in Mr. Thomas's favor.   While TFO Geisel omitted this from his report, the fact remains that Mr. Thomas's keys did not open the clubhouse door.   Further, Mr. Thomas maintained that he did not live at the clubhouse—another fact that TFO Geisel omitted from his reports.   Finally, a reasonably prudent person would assume that Mr. Thomas resided with his wife, yet there was no evidence that Ms. Thomas resided at the clubhouse and TFO Geisel made no effort to contact her or even to acknowledge her existence.   Indeed, any reasonable person with knowledge of motorcycle clubs, especially Lt. Hoadley, who identified himself as an expert, would know that women are not allowed to live in their clubhouses.

2.   <u>Any alleged consent provided by Jacob Quick was involuntary</u>.

The government may claim that Mr. Quick consented to the search.   The burden is on the government to show consent.   *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).   Here, the evidence establishes that Mr. Quick did not voluntarily consent to law enforcement's efforts to enter the clubhouse.   When Lt. Hoadley first asked Mr. Quick to let law enforcement into the house to "make sure there are no parole violations," Mr. Quick refused, responding that there were no violations.   Exhibit E, Gallup at 00:11:56-00:12:09.   Law enforcement accused him of locking the door and hiding the keys.   And

later, he refused to sign a written consent for a forcible entry.

In addition, any alleged consent by the time law enforcement gained entry by picking the lock was coerced by a combination of factors, including a false claim of authority.   Purported consent "must be viewed in light of the officer's actions that preceded it, rather than in a vacuum."   *United States v. Bautista*, 362 F.3d 584, 591–92 (9th Cir. 2004).   Specifically, law enforcement informed Mr. Quick that they had lawful authority to enter and search the clubhouse without a warrant based on Mr. Thomas's status as a parolee.   In effect, law enforcement announced that he had no right to resist the search, a "situation [ ] instinct with coercion—albeit colorably lawful coercion."   *Bumper*, 391 U.S. at 550*; see also Orhorhaghe v. INS*, 38 F.3d 488, 500-501 (9th Cir. 1994) (holding that consent was involuntary when INS agents made misleading statements implying they did not need a warrant to enter an apartment).   In addition, law enforcement repeatedly informed Mr. Quick that Mr. Thomas would be arrested and even claimed that he would be incarcerated for ten years unless Mr. Quick cooperated.   *See United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir. 1980) (holding that consent was involuntary where police threatened an arrest if consent to search was refused).   In addition, law enforcement had asserted their authority directly over him throughout their interactions, from the unjustified frisk for weapons through their prolonged detention and refusal to permit him to use his phone.   Law enforcement's statements and conduct were specifically calculated to induce fear and apply pressure.   This coercion, on its own, and in conjunction with the false claim of authority as well as the police-dominated atmosphere, was enough to render

any alleged consent involuntary.   *See, e.g., United States v. Marshall*, 488 F.2d 1169, 1188-89 (9th Cir. 1973) (holding that the presence of a large number of officers, while not per se coercive, can, in tandem with other factors, contribute to a finding that consent was involuntary).

In sum, Mr. Quick declined officers' request that he voluntarily provide them access to the clubhouse.   To the degree that he ever manifested consent, it was only after officers asserted that he was required to provide them access and threatened to imprison his friend if he refused.   Mr. Quick's acquiescence to these strong-arm tactics did not excuse law enforcement officers from complying with the warrant requirement of the Fourth Amendment.

> 3.   <u>The search of the clubhouse, premised on Mr. Thomas's parole status and his membership in the Devils Diciples Motorcycle Club, and justified by a Task Force Officer rather than a parole officer, constituted an unreasonable and harassing search in violation of the Fourth Amendment.</u>

Mr. Thomas's parole conditions did not prevent him from associating with the DDMC.   <u>Exhibit A</u>.   Indeed, subject to reasonable restrictions and fair notice of such restrictions, Mr. Thomas had a First Amendment right to associate with the DDMC and to wear his DDMC vest.   *See United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983). Significantly, prior to May 13, 2016, TFO Geisel never cited Mr. Thomas for a parole violation for riding with the club and never confiscated his DDMC vest.   Yet, the Task Force (drawing upon TFO Geisel's authority granted by Pardons and Parole) as well as local law enforcement justified suspicionless detentions (e.g., on April 12, 2016, and May

13, 2016), conducted multiple "parole" searches (e.g., on January 14, 2016, April 21, 2016 (attempted), and May 13, 2016), and engaged in general harassment and intimidation (i.e., on May 13, 2016) based solely on Mr. Thomas's parole status and membership in the club.

The Ninth Circuit has held that submission to intimidating and harassing searches and interrogation solely to serve law enforcement ends should not be the price of parole. *See United States v. Consuelo-Gonzalez*, 521 F.2d 259, 265 (9th Cir. 1975) (en banc); *cf. United States v. King*, 736 F.3d 805, 810 (9th Cir. 2013) ("Nor do we condone [probation] searches that are conducted for illegitimate reasons, such as harassment."). Further, while law enforcement does not impermissibly circumvent the Fourth Amendment by acting in concert with parole officers, *see United States v. Knights*, 534 U.S. 121 (2001), this case presents a separate issue. This is not a case were TFO Geisel simply worked in concert with law enforcement. To the contrary, TFO Geisel effectively relinquished his role as a parole officer by taking on the mantle of a Task Force officer. Exhibit K (requiring that a Task Force Officer must "function effectively apart from their parent agencies and accept direction from a supervisor from a different organization"). The Task Force mission, i.e., to investigate and prosecute criminal organizations, including the DDMC, *became* TFO Geisel's overriding objective. *Id.* By failing to notify Mr. Thomas of his true role, TFO Geisel abused his position of trust and breached one of the fundamental purposes of parole, i.e., rehabilitation and reintegration into society, when Mr. Thomas agreed to the conditions of his parole. A search premised on a parole search condition under these circumstances is unconscionable and unreasonable in violation of the Fourth Amendment and the Due

Process Clause of the Fourteenth Amendment.

B. <u>Law enforcement subjected Mr. Thomas to an unreasonably prolonged detention in violation of the Fourth Amendment.</u>

The officers violated the Fourth Amendment through their prolonged detention of Mr. Thomas, extending his seizure well beyond the time required to complete the investigation of the 911 call.   "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015).

Law enforcement learned that Mr. Thomas was on felony parole as the original 911 call investigation concluded and apparently based the continued detention on their intent to investigate his compliance with the conditions of his parole.   However, the mere fact that Mr. Thomas was on parole did not permit officers to continue to detain him.   The law is clear:   officers must possess a reasonable belief that a parolee has violated parole to detain him for that violation.   *See Turner v. Craig*, No. C 09-03652 SI, 2011 WL 2600648, at *9 (N.D. Cal. June 30, 2011) aff'd, 510 F. App'x 587 (9th Cir. 2013) (citing *United States v. Rabb*, 752 F.2d 1320, 1324 (9th Cir. 1984) abrogated on other grounds by *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)).   Moreover, officers must be aware of the parole condition or conditions they believe have been violated.   *See Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005) overruled on other grounds by *United States v. King*, 687 F.3d 1189 (9th Cir. 2012) ("[T]he facts upon which the reasonableness of a search or seizure depends, whether it be an outstanding arrest warrant, a parole condition,

or any other fact, must be known to the officer at the time the search or seizure is conducted."); *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008) (parole "search condition validates a search only if the police had advance knowledge that the search condition applied before they conducted the search").

As of 12:02 p.m., law enforcement unreasonably prolonged the detention of Mr. Thomas based on their mere suspicion that he had violated his parole by associating with the DDMC.   The detaining officers had no knowledge of terms of Mr. Thomas's parole agreement that might prohibit such association (and there were none).   In fact, as Mr. Thomas repeatedly stated, both his parole officer and the FBI knew that he was an active member.   Moreover, Lt. Hoadley further prolonged the detention by suggesting to PPO Matthews that the 911 call was legitimate and the investigation was ongoing when in fact the call was bogus and the investigation closed as a mere property dispute.   Mr. Thomas's statements made after 12:02 pm and the physical evidence eventually discovered in the search are the fruits of the prolonged illegal detention and should be suppressed.

C. Law enforcement elicited unwarned and involuntary statements from Mr. Thomas by failing to advise him of his *Miranda* rights and by resorting to coercive interrogation techniques.

1. Law enforcement elicited unwarned statements from Mr. Thomas.

The Fifth Amendment prohibits the government from compelling an individual to incriminate herself.   U.S. Const. Amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself.").   Before conducting a custodial interrogation, police must give a suspect his *Miranda* warnings.   *Miranda v. Arizona*, 384

U.S. 436 (1966).   Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.   *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).   Questioning reasonably likely to elicit an incriminating response constitutes an interrogation.   *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008).

Factors in determining whether an individual is "in custody" include: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of interrogation; (4) the duration of detention; and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).   Reasonable and necessary steps to detain a defendant for purposes of the Fourth Amendment, such as reasonable restrictions on movement, are relevant to whether he was entitled to *Miranda* warnings before the police questioned him.   In *Kim*, the Ninth Circuit stated that a detention can become custodial if the factors create a "police-dominated atmosphere."   *Id.* at 976-977. Informing a defendant that he is not free to leave and otherwise "isolating the defendant from the outside world" are factors weighing in favor of a finding of custody.   *Id.*

In this case, at least five law enforcement officers not only detained Mr. Thomas but established a police-dominated atmosphere, seizing his keys, his vest, and other property, as well as leading him by the arm to an isolated location, controlling his movements, and ultimately directing him to enter the clubhouse while the leaseholder was

forced to remain outside.   Law enforcement's technique of isolating Mr. Thomas from his friends is one of the distinguishing features of a custodial interrogation.   *Craighead*, 539 F.3d at 1087 (citing *Miranda*, 384 U.S. at 445-46, 448-50).   Moreover, from the moment law enforcement learned that Mr. Thomas was a parolee and member of the DDMC, they repeatedly challenged and mocked him, accused him of using drugs, accused him of lying, and accused him of living at the clubhouse.   Questioning continued even after Mr. Thomas told the officers "I'm done talking to you guys, please." Exhibit E, Matthews at 00:44:44.   Once inside the clubhouse, law enforcement confronted him with evidence of his alleged guilt and continued to state that he lived there despite his protestations.

When viewed in their totality, these facts demonstrate that Mr. Thomas's "freedom of action was restrained in a way that increased the likelihood that he would succumb to police pressure to incriminate himself."   *Craighead*, 539 F.3d at 1086.   Based on all these factors, Mr. Thomas was in custody at the time he made incriminating statements in response to law enforcement's questioning.

Further, Mr. Thomas's statements were in response to questions reasonably likely to eliciting incriminating responses.   Here, law enforcement repeatedly asked him whether he had used drugs.   After the rifle was found, law enforcement asked him questions designed to tie him to the location where the firearm was found.   And later, after the drugs were found, he was again asked questions about his access and control over the toolbox.   Mr. Thomas's unwarned inculpatory statements obtained while in police custody on May 13, 2016, are presumed to be compelled, and thus are required to be

excluded from evidence at trial in the government's case in chief.   *Miranda*, 384 U.S. at 476, 479.

*Miranda* also requires suppression of Mr. Thomas's statements made on May 16, 2016 during a jail interview conducted by TFO Ostrander.    At that interview, Mr. Thomas was given his *Miranda* warnings for the first time.   Here, Mr. Thomas's subsequent statements resulted from an impermissible two-step interrogation strategy, i.e., law enforcement deliberately withheld *Miranda* warnings until they obtained Mr. Thomas's admissions and then provided the warnings to obtain a repetition of the already given confession.    This two-step strategy rendered the intervening *Miranda* warnings ineffective.   *Missouri v. Seibert*, 542 U.S. 600, 601 (2004) (plurality); *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006).

A two-step interrogation requires suppression of the second interrogation when (1) law enforcement officers "*deliberately* employ a two-step interrogation to obtain a confession" and (2) the second warning was "objectively ineffective" such that it would "fail to apprise a *reasonable* person in the suspect's shoes of his rights."   *Williams*, 435 F.3d at 1158.   With respect to whether law enforcement officer's failure to provide *Miranda* warnings was deliberate, "'the intent of the officer will rarely be . . . candidly admitted.'" *Id.* at 1158 (quoting *Seibert*, 542 U.S. at 617).   Thus, in addition to any evidence of subjective intent to thwart *Miranda*, the Court should consider objective evidence such as "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning

statements." *Id.* at 1159.   With respect to the second factor—the adequacy of the second warning—this Court should consider a similar series of relevant facts:   the completeness and detail of the questions and answers in the first round of interrogation; the overlapping content of the two statements; the timing and setting of the first and the second; the continuity of police personnel; and the degree to which the interrogator's questions treated the second round as continuous with the first.   *Seibert*, 542 U.S. at 615.

These factors tip against admission of the second confession.   The first round of questioning was extensive both in scope and duration.   Further, the content of the two statements overlapped, and while the second statement was separated by three days, TFO Ostrander was present for both and specifically stated that he simply needed confirmation of what Mr. Thomas had already told TFO Geisel.

### 2.   Mr. Thomas's statements were involuntary.

It is the government's burden to prove by a preponderance of the evidence that a criminal defendant's statement was voluntary.   *Bautista*, 362 F.3d at 589 (citing *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981)).   "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."   *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002) (internal quotations omitted).

As noted above, Mr. Thomas was in custody shortly after law enforcement learned he was a parolee and active member of the DDMC.   Lt. Hoadley was the most hostile of

the law enforcement officers at the scene, at one point getting right in Mr. Thomas's face and telling him that the place was going to be crawling with cops unless he changed his attitude.   During the course of their questioning, Lt. Hoadley and other officers mocked Mr. Thomas, berated him for his membership in the DDMC, accused him of using drugs, and called him a liar.   Mr. Thomas's statements that he felt he was being harassed and that he wished to cease talking to the officers is evidence that these tactics did exert impermissible psychological pressure.   Indeed, law enforcement's failure at any point to provide *Miranda* warnings and their continued questioning even after Mr. Thomas stated he did not want to continue speaking to the officers "can be viewed as an aggravation of other coercive tactics."   *California Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1046–47 (9th Cir. 1999).

Law enforcement also used threats of incarceration, based upon Mr. Thomas's parole status, to leverage a confession.   Officers repeatedly suggested that because he inevitably would be tested as a condition of his parole, being truthful about his use would help him.   That leverage continued with the arrival of parole officers.   Having already been coerced into an admission that he had recently used, Mr. Thomas knew that the failure to cooperate with his parole officer would necessarily lead to revocation of his parole and even new charges.   All these factors worked to undermine his will to resist.   Mr. Thomas's subsequent statements in the clubhouse were a product of this coercive setting. Further, the government cannot rely on Mr. Thomas's parolee status to claim that his statements were not coerced.   In *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984), the

Memorandum In Support Of Motion To Suppress     29

Supreme Court rejected the view that the probationer-probation officer relationship is inherently coercive, but the Court "emphasize[d]" that the probationer in that case was not in custody when his probation officer questioned him.  *Minnesota v. Murphy*, 465 U.S. 420, 429, 429 n.5 (1984).   The Court said that a "different question would be presented if he had been interviewed by his probation officer while being held in police custody[.]" *Id.* at 429 n.5.   That is precisely the situation here, as Mr. Thomas had already been in police custody for nearly an hour, and subjected to aggressive police questioning, before TFO Geisel arrived.

Because Mr. Thomas's statements were the product of coercion, above and beyond the *Miranda* violation, the Court should bar the Government from using those statements for any purpose.   *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("[A]*ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ."). Further, the admissibility of Mr. Thomas's May 16 jail interview also must be excluded under the general "fruit of the poisonous tree" analysis applicable to a coerced confession. *See United States v. Patterson*, 812 F.2d 1188, 1192 (9th Cir. 1987).   Because Mr. Thomas's subsequent confession was elicited by a law enforcement officer who participated in the earlier, coercive interrogation, was framed as a continuation of the earlier interrogation, and took place in the confines of the jail, it was tainted by the earlier statement and should be suppressed.   *See* i*d.*

### III. <u>CONCLUSION</u>

In the course of investigating a serious but ultimately false report, law enforcement

stumbled upon the DDDMC clubhouse.    Overzealous police officers then embarked on a witch hunt in an effort to justify a search the clubhouse without regard for Mr. Thomas's constitutional rights.    To vindicate those rights, Mr. Thomas respectfully requests the Court to suppress evidence from the unlawful detention, search and interrogation on May 13, 2016, and the unlawful interrogation on May 16, 2016.    Mr. Thomas further requests the Court to conduct an evidentiary hearing at a time to be determined by the Court.

Dated:    December 13, 2016        Respectfully submitted,
                                   SAMUEL RICHARD RUBIN
                                   FEDERAL PUBLIC DEFENDER
                                   By:


                                   /s/ Mark J. Ackley_____
                                   Mark J. Ackley
                                   ASSISTANT FEDERAL PUBLIC DEFENDER
                                   FEDERAL DEFENDER SERVICES OF IDAHO
                                   Attorneys for the Defendant
                                   SCOTT ARLIS THOMAS