Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Mark J. Ackley
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:    (208) 331-5525

Attorneys for Defendant
SCOTT ARLIS THOMAS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE B. LYNN WINMILL)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> SCOTT ARLIS THOMAS, ) <br> ) <br> Defendant. ) <br> ) | CR16-247-S-BLW <br><br> CLOSING ARGUMENT IN SUPPORT OF MOTIONS TO SUPPRESS |

## CLOSING ARGUMENT

*Does Grandberry control the outcome of this case?*

Law enforcement justified their search of the clubhouse based on the "residence search" condition in Mr. Thomas's parole agreement. (Dkt. 50, Tr. p.315, Ls.2-6 (Q. [T]his search was predicated on a residence search?   A. Correct.   Q. Pursuant to a parole

Closing Argument                                   1

agreement?  A. Yes.)[1]  However, that condition justifies the search only if this Court concludes that the officers had probable cause to believe that Mr. Thomas lived at the clubhouse.  *See United States v. Grandberry*, 730 F.3d 968, 975 (9th Cir. 2013).  This "is a relatively stringent standard which requires more than a mere well-founded suspicion. There must be strong evidence that [Mr. Thomas] reside[d] at the address." *Id*. at 976 (brackets, citations and internal quotation marks omitted).

The Government seeks to re-characterize the clubhouse as "non-residential real property," drawing upon a footnote in *Grandberry* which left open whether the probable cause standard applies to real property such as a "storefront" or "warehouse." *Id.* at 982 n.14.  The facts do not support the Government's argument.  For example, although Officer Adam Matthews described the clubhouse as "kind of an industrial building," (Dkt. 49, Tr. p.44, Ls.6-8), Officer Dan Geisel, who authorized the search, could not rule out the possibility it was a house.  (Dkt. 50, Tr. p.281, Ls.17-19 (Q. This property, it was not a house, correct?  A. It was hard to tell from the outside, essentially.).  Tellingly, Officer Geisel repeatedly characterized the building as a "dwelling" or "residence" throughout his testimony.  (Dkt. 49, Tr. p.123, Ls.14-16; p.125, Ls.8-9; p.126, Ls.1-2; p.129, Ls.23-24; p.145, Ls.11-14.)  The recordings provide further support for this assessment.  (*See* Def. Ex. E, Matthews at 2:34 (depicting the clubhouse with a chimney, a satellite dish, a separate

---

[1] The Government has raised other exceptions to the Fourth Amendment's search warrant requirement.  Mr. Thomas relies on his prior briefing to address such exceptions.  The fact that these exceptions were not identified by Officer Geisel at the time he authorized the search should alert the Court to the incentives that law enforcement have to interpret the circumstances that they observed in a manner to support post hoc justifications for the search.

Closing Argument                                2

entrance, at least two windows (one with an air conditioning unit and one left of the door), and a washer/dryer to the right of the door).) *Id.* Further, law enforcement knew that its recent occupants were either members or friends of the Devils Diciples Motorcycle Club ("DDMC") and that it served as the "center of activity" for the DDMC (which had not been labeled an outlaw motorcycle gang). (Dkt. 50, Tr. p.329, L.3 – p.330, L.19.) All of these features led law enforcement to reasonably conclude that the clubhouse was either a residence or dwelling, or its functional equivalent.

Even if the clubhouse has elements which differentiate it from a typical home, the same was once said of motel rooms, and yet the Ninth Circuit rejected such form-over-substance distinctions, stating in part that "[r]esidential arrangements take many forms." *United States v. Franklin*, 603 F.3d 652, 656, 657 (9th Cir. 2010); *see also State v. Pruss*, 181 P.3d 1231, 1234 (Idaho 2008) ("The respect for the sanctity of the home does not depend upon whether it is a mansion or hut, or whether it is a permanent or a temporary structure."). Thus, *assuming arguendo* that the Ninth Circuit would exclude warehouses and storefronts from the probable cause standard, the clubhouse in this case is qualitatively different from those types of property. As stated by one federal district court:

> [The motorcycle clubhouse] is outside of the home, yet remains private and, thus, qualitatively different from the other public spaces it resembles physically. The private nature of such a communal space is a constitutive element of the space; it facilitates non-familial, communal associations that ultimately serve valuable and civic ends in our society.

*Warren v. Williams*, No. CIV.A. 304CV537 JCH, 2006 WL 860998, at *11 (D. Conn. Mar. 31, 2006).

Closing Argument 3

*Did officers have probable cause that Mr. Thomas resided at the clubhouse?*

In *Grandberry*, the court identified four factors which, viewed cumulatively, may establish probable cause. *Grandberry*, 730 F.3d at 976. The following chart compares the facts in *Grandberry* with the testimony from the evidentiary hearing.

| **Factor #1: The parolee does not appear to be residing at any other address** ||
|---|---|
| Grandberry reported an address other than the address searched six *months* prior to the search. | Mr. Thomas reported the Ten Lane address less than six *weeks* prior to the search. (Dkt. 50, Tr. p.257, L.10 – p.259, L.20; p.285, Ls.5-15.) |
| Surveillance for 1-2 hours during the middle of the day, as opposed to the early morning or evening hours "when someone who lived there was most likely to be at home." | No surveillance: the documented attempt to verify the reported address lasted a couple minutes and was during the day (prior to curfew) when Mr. Thomas was less likely to be at home. The undocumented attempt cannot be corroborated by other witnesses. (Dkt. 49, Tr. p. 212, Ls.9-17; Dkt. 50, p.289, L.5 – p.290, L.6.) |
| Officers made no attempt to locate or interview any neighbors at the reported address. | Officers made no attempt to interview any neighbors, Mr. Thomas's treatment provider, or his wife, and disregarded statements of the leaseholder and property manager. (Dkt. 49, Tr. p.191, Ls.23-25; Dkt. 50, Tr. p.253, Ls.13-21; p.238, L.6 – p.242, L.8; p.265, Ls.2-13; p.268, Ls.9-19; p.274, Ls.4-6; p.379, L.18 – p.380, L.1.) |
| **Factor #2: Officers observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base.** ||
| *Over a 10-day period*, officers observed Grandberry enter the address several times, typically with keys and on his own. | Officers observed Mr. Thomas exit the clubhouse with Mr. Quick and Mr. Rambow. Officer Geisel observed a large trailer, a full-sized SUV, a camper, and a dog previously kept at another address. |
| On the day of the search, officers observed Grandberry walking toward the address. | Officer Geisel claimed that he had information from TFO Ostrander that Mr. Thomas was spending all his recent time at the clubhouse.[2] |

---

[2] Inconsistencies between the testimony of Officer Geisel and TFO Ostrander show that

Closing Argument                 4

| **Factor #3: The parolee had a key to the residence searched.** ||
|---|---|
| Officers observed Grandberry enter the unreported address several times, typically with keys and on his own. *On the day of the arrest*, officers observed Grandberry toss the keys to the unreported address to the ground. | Mr. Thomas possessed keys, but not keys to the clubhouse. Mr. Quick had keys to the clubhouse, but not on him. Officer Matthews believed that Mr. Quick locked the door and tossed his keys inside the clubhouse. (Def. Ex. E, Matthews at 1:16:22-1:16:31 ("I think [Mr. Quick] hid the key and he threw the keys in there[.] . . . [T]hey're probably inside on the floor.").) |
| **Factor #4: Either the parolee's co-resident or the parolee identified the residence searched as that of the parolee.** ||
| Nobody reported that Grandberry lived at the residence. | Nobody reported that Mr. Thomas lived at the residence. Mr. Thomas, the property manager, and the leaseholder all denied that Mr. Thomas resided there. Officers did not attempt to contact |

---

information relayed to Officer Geisel was, at best, unreliable and stale. Officer Geisel indicated that he received the information between April 21st and May 13th. (Dkt. 49, Tr. p.137, Ls.14-16.) TFO Ostrander testified that he learned this information in late February or early March of 2016, the time period that Derek Riley was incarcerated, and was "very sure" that he communicated it to Officer Geisel in March of 2016 (i.e., prior to the date that Mr. Thomas reported the Ten Lane address). (Dkt. 50, Tr. p.305, L.24 – p.306, L.12.) Similarly, Officer Geisel indicated that he did not know the source of the information or whether it was reliable, (Dkt. 49, Tr. p.139, Ls.13-18), while TFO Ostrander testified that he provided the source, (Dkt. 50, Tr. p.297, Ls. 18-24.) Even if the Court credits some of the testimony, "a parolee's presence at a residence, even if frequent, does not, standing alone, establish probable cause that the parolee lives there." *Grandberry*, 730 F.3d at 978. The noted inconsistencies, as well as other "oversight[s]" and "mistake[s]" acknowledged by Officer Geisel, (*see, e.g.,* Dkt. 49, Tr. p.190, Ls.11-14; p.220, Ls.22-23), are the direct result of his motive and bias, as a task force officer, to secure a prosecution against Mr. Thomas and to further the Task Force's investigation of the DDMC. The extent of Officer Geisel's bias—and credibility problem—is demonstrated by the fact that he altered at least one of his contact note entries in anticipation of this litigation and then testified falsely about it. (*Compare* Dkt. 49, Tr. p.188, Ls.18-20, *with* Dkt. 50, Tr. p.356, L.10.) A "judge's assessment of the motives of the officers may occasionally influence his judgment regarding the credibility of the officers' claims with respect to what information was or was not available to them at the time of the incident in question." *Scott v. United States*, 436 U.S. 128, 139 n. 13 (1978). Mr. Thomas asserts that the Court should apply this greater level of scrutiny not only to Officer Geisel's testimony about the information he learned from TFO Ostrander but also his testimony that he conducted a second attempt to verify Mr. Thomas's Ten Lane address.

|  | either Mr. Thomas's wife or nephew, i.e., those with whom he reported living.  (Dkt. 50, Tr. p.273, Ls.6-13; p.327, L.21 – p.328, L.5.) |
|---|---|

This case is less compelling for the Government than *Grandberry*, in which the court found the objective facts did not establish probable cause.   To the extent the Court believes it to be a closer case, Mr. Thomas directs the Court to Officer Geisel's statements suggesting that he relied on something less than probable cause.   (Dkt. 49, Tr. p.151, L.13 (Q. So prior to entering into this building, you believe that he was residing there; correct? A. I had my suspicions, yes.); p.122, Ls.14-16 ("the thought crossed my mind" that Mr. Thomas "could be residing in this area[.]")); (Def. Ex. E, Matthews at 1:46:57 – 1:47:00 ("I don't know Scott, call this intuition, but I have a feeling you're living here.").)   As stated by the Fifth Circuit, "in a close case, the denial by those officials that probable cause existed may well tip the balance toward a finding of no probable cause." *United States v. Gray*, 659 F.2d 1296, 1301 n.8 (5th Cir. 1981).

### *Can the search be justified under the Agreement of Supervision?*

Though Officer Geisel premised his search upon the residence search condition in Mr. Thomas's Parole Agreement (*see* Gov. Ex. 1b, Def. Ex. G.), the Government maintains that the search provision in the Agreement of Supervision, (*see* Gov. Ex. 1a), constitutes an independently valid and much broader waiver.[3]   The Government's argument is

---

[3] Officer Geisel relied upon the Parole Agreement, not the Agreement of Supervision, for his Task Force report and Report of Violation.   (Gov. Ex. 1b; Def. Ex. Z.)   Similarly, he provided TFO Ostrander the Parole Agreement, not the Agreement of Supervision, for the search warrant application.   (Dkt. 50, Tr. p.316, L.5 – p.317, L.9.)

Closing Argument                                6

contrary to controlling Idaho law:   To the extent the Agreement of Supervision purports to impose a substantively broader search condition than the Parole Agreement, it is invalid. *See Mellinger v. Idaho Dep't of Corr.*, 757 P.2d 1213, 1219 (Idaho Ct. App. 1988) (only the Commission of Pardons and Parole can set substantive terms of parole).

A recent decision, *State v. Santana*, -- P.3d --, 2017 WL 875974 (Idaho Ct. App. Mar. 6, 2017), establishes that the controlling waiver is the one in the Parole Agreement. In *Santana*, the sentencing court placed the defendant on probation without a Fourth Amendment waiver.   *Id.* at *1.   However, the defendant's probation officer later "required [him] to sign a probation agreement" with a broad waiver.   *Id.*   The *Santana* court rejected the state's attempt to justify a subsequent search under the probation agreement.   *Id.* at *3.   The court explained that a probation agreement "is in the nature of an administrative document that procedurally sets forth how the substantive conditions will be enforced" and therefore could not, for instance, "expand [a drug testing] condition to include a search of the probationer's vehicle at the time of the drug test."   *Id.* at *3.

Idaho's probation system differs from Idaho's parole system only in the entities involved.   With respect to probation, Idaho law vests "the sentencing court with the authority to set the substantive terms and conditions of probation," *id.* at *2 (citing I.C. § 19-2601(2)), while for parole, the Commission for Pardons and Parole, "in releasing a person on parole, shall specify in writing the conditions of parole, and a copy of such conditions shall be given to the person paroled," I.C. § 20-228.   Just as it is "essential" that the sentencing court pronounce substantive probation conditions at the time it is

imposed so that the probationer can exercise "the right to decline probation when he or she deems its conditions too onerous," *Santana*, 2017 WL 875974, at *2, parole conditions must also be imposed and accepted prior to release, I.C. § 20-228. *See also* Idaho Admin. Code § 50.01.01(350)(04) (*Prior to any release to parole*, the offender must sign a contract with the commission and must acknowledge all general and special conditions of parole." (emphasis added)). In both systems, the supervising entity is *not* the same as the entity responsible for setting forth substantive conditions. The supervising entity only has authority to "impose supervisory conditions," *Mellinger*, 757 P.2d at 1219, i.e., "set[ting] forth how the substantive conditions will be imposed," *Santana*, 2017 WL 875974, at *3.

*Santana* also forecloses the Government's attempt to shoehorn the legitimacy of the Agreement of Supervision into the Parole Agreement based on general condition 5(c) of the Parole Agreement which required Mr. Thomas to "follow written and oral instructions of the parole officer." (Dkt. 49, Tr. pp.95-96.) *Santana* explicitly rejected the identical argument that "the probation order contemplated a Fourth Amendment waiver by requiring Santana to cooperate with the rules and terms of the probation department." 2017 WL 875974, at *2. As in *Santana*, that term permitted the Division of Probation and Parole to set "forth how the substantive conditions will be enforced," not to alter or expand those conditions. *Id.*, at *3.

Finally, as previously briefed, the term "controlling authority" is unconstitutionally vague. To the extent the Court finds that it survives constitutional challenge, the term should be interpreted against its drafter, i.e., the Division of Probation and Parole's legal

department. (Dkt. 49, Tr. p.91, L.23 – p.92, L.3.) Leaving the interpretation to parole officers' imaginations denies parolees notice of the scope of their Fourth Amendment waivers and invites arbitrary application. And when the parole officer is a Task Force Officer, it is like letting the fox guard the henhouse.[4] Nevertheless, even Officer Geisel's take on the term demonstrates why the search was not justified.

> Q. Can you, I guess, clarify your understanding of "controlling authority?"
>
> A. Yes, ma'am. My best example would be if an offender has a key to a padlock that would be on a shed that he claimed the shed was not his, he would ultimately be the controlling authority as he has free access and controls what's inside that shed.

(Dkt. 49, Tr. p.106, Ls.9-15.) The absence of keys suggests a lack of control. *See, e.g., United States v. Taylor*, No. 97-10125-01, 1998 WL 227161, at *6 (D. Kan. Apr. 18, 1998) ("Taylor's production of the keys implies that he has control over and knowledge of the contents of the tanks."); *United States v. Thompson*, 495 F.2d 165, 169 (D.C. Cir. 1974) (finding that appellant's possession of "keys found to fit the lock" of an apartment "tended to show" that he "had access and control" over the apartment."). While Mr. Thomas was the president of the club, the fact he did not have keys, in conjunction with the fact that he was not the leaseholder, demonstrates that he was not the controlling authority. In

---

[4] The Court directed the parties to address cases relating to parole/probation authorities acting as a "stalking horse." Mr. Thomas acknowledges that after *United States v. Knights*, 534 U.S. 121 (2001), and *Samson v. California*, 547 U.S. 843 (2006), "cases holding searches of [parolees] invalid on the ground that they were subterfuges for criminal investigations is, in that respect, no longer good law." *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002). Nonetheless, parole searches that are arbitrary, capricious or harassing remain barred by the Fourth Amendment. *Samson*, 547 U.S. at 856. Mr. Thomas maintains that this search was harassing.

Closing Argument                                     9

addition, the only known incident of anyone excluding others from the clubhouse involved Mr. Quick. (Dkt. 50, Tr. p.312, L.24 – p.313, L.2 (describing an incident where Mr. Quick kept someone out of the clubhouse).)

The Government argues that Mr. Thomas controlled Mr. Quick (and thus the clubhouse) through verbal and nonverbal communication. The self-serving interpretation of their interaction is insufficient to meet the Government's burden, especially when there is objective evidence that Mr. Quick acted early and independent of Mr. Thomas in denying law enforcement access to the clubhouse. (*See, e.g.,* Dkt. 49, Tr. p.47, Ls.4-9; p.82, L.14 – p.83, L.13 (indicating that Mr. Quick closed and allegedly locked the clubhouse door without any prompting from Mr. Thomas).) The evidence indicates that Mr. Quick, as the leaseholder, was the controlling authority, a fact that even Officer Geisel implicitly recognized by seeking (but not obtaining) Mr. Quick's consent to enter the clubhouse.

Dated: April 24, 2017

Respectfully submitted,

SAMUEL RICHARD RUBIN
FEDERAL PUBLIC DEFENDER
By:


/s/ Mark J. Ackley
Mark J. Ackley
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL DEFENDER SERVICES OF IDAHO
Attorneys for the Defendant
SCOTT ARLIS THOMAS

CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing Closing Argument in Support of Motions to Suppress was served on all parties named below on this 24th day of April 2017.

| | |
|---|---|
| Tara Malek, Special Assistant US Attorney<br>Office of the United States Attorney<br>Washington Group Plaza, IV<br>800 Park Blvd, Suite 600<br>Boise, ID 83712<br>tara.malek@usdoj.gov | _____ United States Mail<br>_____ Hand Delivery<br>_____ Facsimile Transmission<br>\_\_X\_\_ CM/ECF Filing<br>_____ Email Transmission |

Dated: April 24, 2017         /s/ _____
                              Mark Ackley