UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT ARLIS THOMAS,<br><br>Defendant. | Case No. 1:16-CR-0162-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

The Court has before it defendant Thomas's motion to suppress. Thomas seeks to suppress a firearm and drugs – seized during a search of the clubhouse of a motorcycle gang – that form the basis for a two-count indictment against him. The Court held a two-day evidentiary hearing on March 23 and 24, 2017, and allowed further briefing that was received on April 24, 2017. The motion is now fully submitted. For the reasons explained below, the Court finds that the search of the clubhouse violated Thomas's Fourth Amendment rights.[1]

**FINDINGS OF FACT**

On August 28, 2014, the Idaho Commission of Pardons and Parole ("Commission") granted Scott Thomas parole on sentences imposed on drug trafficking

---

[1] This resolution moots a dispute over the defense's subpoena seeking certain documents and testimony that the Government argued were privileged. Because the defense prevailed without the information it sought, there is no longer any need to determine whether the items are privileged or otherwise exempt from production. The Court will therefore deem as moot the Government's Motion to Quash or for Protective Order.

**Memorandum Decision & Order – page 1**

and firearms charges.  As a parolee, Thomas was under the supervision of the Board of Correction ("Board"), and assigned to a Parole Officer ("PO"), Clayton Duin.

PO Duin knew that Thomas was a member of a motorcycle gang known as the "Devils Diciples" ("DD"),[2] and that this gang was being investigated for criminal activity by the Treasure Valley Metro Violent Crime Task Force ("Task Force").  Although PO Duin was not a member of the Task Force, another Parole Officer – Daniel Geisel – was a Task Force member, and so PO Duin transferred supervision of Thomas to PO Geisel.

As a Task Force member, PO Geisel was part of a team including the FBI, the Caldwell Police Department, and selected Parole Officers.  Their mission was to investigate criminal enterprises responsible for drug trafficking and gang activity.  They were actively investigating DD for conducting illegal activity.

When the Commission placed Thomas on parole, they imposed on him a set of conditions, including a waiver that affected his Fourth Amendment rights.  More specifically, he agreed to submit to a search of his "residence" at any time and place.  *See Commission Conditions (Dkt. No. 19-2)*

After the Commission granted parole and passed the supervision of Thomas to the Board, Thomas signed a separate set of conditions drafted by the Board that, among other things, expanded the scope of the Fourth Amendment waiver imposed by the Commission.  Under the Board's conditions, Thomas agreed not only to submit to a

---

[2] Whether this misspelling of "Disciples" was intentional or just a mistake was not revealed at the evidentiary hearing.

**Memorandum Decision & Order – page 2**

search of his residence but also to a search of any "structures . . . for which the defendant is the controlling authority." *See Agreement of Supervision (Dkt. No. 23-1)*.

On January 12, 2016, PO Geisel received notice that Thomas had been stopped while riding his motorcycle and wearing three items (a vest, hat, and bandana) that signified DD membership. Officer Bendewald had pulled Thomas over, and called the Board to see if they wanted to take any action against Thomas for wearing DD material. He recalls he talked to a Parole Officer (but not which one) who told him that he should confiscate the hat and bandana, but not the vest. The Parole Officer also told Officer Bendewald that Thomas should not be charged with a parole violation for wearing these items.

After learning about this incident, PO Geisel decided to conduct a search of Thomas's residence on January 14, 2016. At that time, Thomas was living on Colorado Avenue in Caldwell. In searching that residence, PO Geisel was accompanied by Task Force Officer Anthony Ostrander and FBI Special Agent Scott Smith, also a member of the Task Force. As PO Geisel searched the house, the Task Force officers questioned Thomas, and obtained from him a set of Bylaws for the DD. PO Geisel's notes of his search results state that Thomas "admitted to being an active member of [DD] and is currently president." *See Offender History (Dkt. No. 19-3)* at p. 54. PO Geisel did not violate Thomas's parole for that admission.

PO Geisel testified that during that visit on January 14, 2016, to Thomas's residence on Colorado Ave., he saw parked out front a gold-colored Ford Expedition, a

camper trailer on the back of a pickup, and a large white trailer. These items all belonged to Thomas. In addition, he saw Thomas's dog.

On April 7, 2016, Thomas told PO Geisel that he needed to move because the house on Colorado Ave. was being sold. *See Offender History, supra.* Later that same day, Thomas reported to PO Geisel that he was now residing at 16965 Ten Lane in Nampa. *Id.* Although PO Geisel's notes state that he "verified" that address, *id.,* he testified that only meant that he entered it into the system, not that he had "verified" that Thomas was in fact residing there. When he did visit the Ten Lane address to determine if Thomas was living there, he did not see Thomas.

PO Geisel's first attempt was on April 21, 2016, and he was accompanied by Task Force officers. When they knocked on the door, there was no answer. PO Geisel did not see any of the property – the gold Ford Expedition, camper, and white trailer – that had been at Thomas's residence on Colorado Ave. PO Geisel and the Task Force members then left the Ten Lane address and eventually found Thomas and other "gang members" at another residence. *Id.*

PO Geisel testified that he made a second attempt to locate Thomas at the Ten Lane address on or about April 28, 2016, but again did not find him there, and did not see any of the items such as the gold Expedition, camper, and white trailer. Both attempts were unannounced and prior to curfew so there was no requirement that Thomas be at home. PO Geisel did not attempt to verify that Thomas was living there by contacting Thomas's wife (although he had her email address and phone number).

PO Geisel asked Task Force member Anthony Ostrander if he had any information on where Thomas was living. Ostrander knew from listening to intercepted jail phone calls between Thomas and his nephew Derrick Reilly that Thomas was spending a significant amount of time at the DD clubhouse performing repairs and framing walls, and he passed this information along to PO Geisel. He did not explain to PO Geisel his source for this tip.

**The Search of the DDMC Clubhouse**

The DD clubhouse was located at 204 West Main Street in Caldwell, Idaho. As of May 13, 2016, the main floor was leased by Jacob Quick, a DD member. The basement was leased by an owner of a hot tub business ("Nate").

On May 13, 2016, Thomas and two fellow motorcyclists – Quick and Brandon Rambow – made a brief stop at the clubhouse to pick up an extra helmet. The group was confronted by Nate, who accused them of damaging his property. Nate's wife called 911 and falsely reported that a "motorcycle gang" was destroying her property and "murdering" her husband. This call understandably caused several officers to respond.

The officers took statements from Nate and the owner of the building, and then took statements from Thomas and his friends. Everyone cooperated with the officers. Officer Gallup concluded that no criminal conduct had occurred. The time was 12:02 p.m.

As Officer Gallup concluded his investigation of the 911 call, Officer Randy Deleon asked Thomas if he was on felony supervision. When Thomas confirmed his status, law enforcement searched him and frisked Quick and Rambow, justifying the

**Memorandum Decision & Order – page 5**

searches based on Thomas's status as a parolee and a concern for weapons, respectively. The Officers found no evidence of criminal conduct or parole violations. The time was now 12:03 p.m.

Lieutenant Joey Hoadley asked Thomas whether it was a violation of his parole to hang out with the DD. Thomas indicated that it was not, and that his parole officer and the FBI knew he was active with the DD. Lt. Hoadley asked if PO Geisel knew that Thomas was "hanging out" at the clubhouse, to which Thomas responded that they were not doing anything wrong and had just come by to pick up a helmet.

Lt. Hoadley then attempted to open the clubhouse door, but it was locked and so he asked Quick to open the door to ensure nobody was inside and there were no parole violations.

Quick responded that there was nobody inside, that there were no violations, and that he must have locked himself out. Lt. Hoadley became agitated, turned his attention back to Thomas and exclaimed, "See how this starts to look when you're on felony probation." Lt. Hoadley's then asked "How is your UA going to look today?" Thomas responded that it would be fine. Lt. Hoadley then departed to contact the Parole Department. The time was 12:05 p.m.

Lt. Hoadley contacted PO Matt Thomas who acts as the liaison with the Metro Task Force. Lt. Hoadley informed him that he had contacted Scott Thomas while responding to a 911 call of "murder in progress" and that Thomas was wearing a DD vest. PO Thomas asked law enforcement to continue to detain Thomas and await his arrival.

**Memorandum Decision & Order – page 6**

The officers kept their position around Thomas, repeatedly asked him whether he had used illegal drugs (which he denied), questioned him about patches on his vest (which he answered), accused the group of intimidating the community (which they denied), and claimed that they locked the door to keep them out of the clubhouse (which they denied). Officer Matthews told them: "You guys think you're getting special attention, you are."

At approximately 12:19 p.m., Officer Randy Deleon took Thomas's helmet, keys, and DDMC vest, while Lt. Hoadley escorted Thomas (by the arm) to the front of the building; other officers remained in the back with Quick and Rambow. Once Thomas was isolated from his friends, Lt. Hoadley began admonishing him, alleging that he had not been cooperative and had acted in a threatening manner, "You want attention. You got attention now homeboy. This place is going to be hot." Thereafter, Officer Matthews, in conjunction with Lt. Hoadley and Officer Deleon, increased the pressure on Mr. Thomas by mocking him and his membership in the DD, accusing him of using methamphetamine, inspecting his arms and nose, calling him a liar, and falsely claiming that he had already admitted to using drugs.

After being asked one more time, Thomas admitted for the first time that he had used methamphetamine a couple days earlier. PO Matthew Thomas arrived at approximately 12:26 p.m., and after a brief discussion with law enforcement and Thomas, called PO Geisel to the scene. Thereafter, the officers continued to press Thomas with accusatory questions about using drugs and his activities at the club. After about ten minutes, Thomas stated: "I'm done talking to you guys, please." Nevertheless, law

**Memorandum Decision & Order – page 7**

enforcement pressed on, claiming (based on the debunked 911 call) that Thomas was terrorizing people by yelling at people when wearing his vest. Mr. Thomas stated that he felt he was being harassed, to which Officer Matthews responded, "Welcome to our world, you don't think we get harassed every day?" Officer Matthews told Thomas that he was receiving this type of attention because he wore a DD vest.

PO Geisel arrived at approximately 12:45 p.m., and told Thomas to show him around the clubhouse. Thomas refused, stating that he did not live there. PO Geisel responded by threatening him, stating, "You want to be out today, you better find a way in," and "Get in the building or you're going to jail."

Thomas responded that Quick was in charge of the building. PO Geisel turned to Quick (the leaseholder), stating, "He is on parole. We have to understand what he is doing here. He needs to get in this building or he is going to jail on a parole violation. It's your guys' choice." Officer Matthews asked whether Thomas had any personal property in the clubhouse to which Thomas indicated that he had some tools for working on the bikes. Officer Matthews then advised Quick that unless they got inside the building, Thomas would spend ten years in prison.

Thomas gave the officers his keys but they did not fit the door lock. PO Geisel told Quick that either Quick could kick in the door or that Thomas was going to jail. Quick said that he was too small, but Thomas's parole officers could try or they could pick the lock. However, Quick refused to sign a consent form permitted them to kick the door in or pick the lock.

**Memorandum Decision & Order – page 8**

Eventually Thomas can be seen on the video nodding to Quick to let the officers into the clubhouse. But Quick has no keys and goes to find the building manager to obtain them.

As law enforcement continued to try to figure out a way inside the clubhouse, PO Geisel contacted additional members of the Task Force. When Task Force Officer Ostrander arrived, he and PO Geisel led Thomas away from the others.

PO Geisel noticed that Thomas had physical characteristics consistent with a user of methamphetamine. In addition, Thomas was wearing a t-shirt displaying a DD insignia. Thomas made statements to PO Geisel that (1) he was President of DD, and (2) that he had used methamphetamine a week earlier. At this time, PO Geisel observed that the gold Ford Expedition, camper, and white trailer were parked at the clubhouse, and Thomas's dog was there as well.

The property manager, James Howard, was present during this incident. He was asked by two different Officers (before the Officers gained entrance to the clubhouse) whether Thomas lived there, and he told them that Thomas did not live there but lived at a separate address. Howard had been inside the clubhouse with Thomas and had seen no evidence that he lived there. But the Officers never asked Howard if he had been inside. Howard also testified that Thomas had a key to the clubhouse, but was never asked during the evidentiary hearing whether he informed the Officers of that fact.

At about 1:22 p.m., Officer Hoeksema arrived at the scene and picked the lock on the clubhouse door. PO Geisel, along with Task Force Officer Ostrander and PO Mathew Thomas, took Thomas into the clubhouse to conduct a search. PO Thomas located a rifle

**Memorandum Decision & Order – page 9**

in a small bedroom.  Law enforcement questioned Thomas about his access to the room where the firearm was found, and Thomas agreed that he had previously been in that room.

Three additional members of the Task Force (Officers Doug Hart, Ryan Seely and Ryan Bonner) arrived to conduct a more extensive search of the clubhouse and interrogate Thomas.  As Task Force Officer Seely was questioning Thomas, Task Force Officer Doug Hart located a small quantity of methamphetamine inside of a toolbox along with a scale and a receipt with Thomas's name on it.

Task Force Officer Seely's report (prepared a month later) states that, during his unrecorded interrogation, Thomas admitted to occasionally spending the night at the clubhouse, admitted to having access or control over the toolbox, and admitted to knowing about the firearm.  Officer Seely did not give Thomas his *Miranda* rights

At about 4:06 p.m. on May 13, 2016, PO Geisel placed Thomas under arrest for parole violations, including: (1) being President of the DD; (2) wearing the DD t-shirt; (3) admitting to using methamphetamine; and (4) possessing the firearm and methamphetamine found in the clubhouse.

At the same time, PO Geisel confiscated two cell phones and turned them over to Task Force Officer Ostrander, who placed them in a safe.  The Officers then transported Thomas to the Canyon County Jail.

About two months later – on July 14, 2016 – the Government filed its Indictment in this case, charging Thomas with one count of illegal possession of a firearm (for the weapon found in the clubhouse search) and one count of possession with intent to

**Memorandum Decision & Order – page 10**

distribute methamphetamine (for the drugs found in the clubhouse search). On the same day, Thomas inquired of Officer Ostrander about his cell phones and was told that they were being held as evidence and that a search warrant was being sought.

Within two days of that call, Officer Ostrander submitted his affidavit in support of a search warrant for the cell phones to the U.S. Attorney's Office. But the search warrant was not obtained until September 26, 2016, more than 4 months after the cell phones were confiscated. When asked why this took so long, Officer Ostrander testified that he and the AUSA were involved in several substantial complicated cases. On September 26, 2016 – about two months after the Indictment was filed and four months after the arrest – Officer Ostrander received a search warrant to examine the cell phones.

**Statements of May 16, 2016**

On May 16, 2016, Task Force Officer Ostrander interviewed Thomas at the Canyon County Jail, and read him his *Miranda* rights. Thereafter, Thomas waived his rights, and told Officer Ostrander that he was a user of methamphetamine but denied selling it, and denied possessing the firearm.

**Motion to Suppress**

Thomas has filed a motion to suppress the following evidence: (1) the gun, drugs, and drug paraphernalia seized on May 13, 2016, during a search of the DD clubhouse; (2) statements made by Thomas on May 16, 2017, and May 27, 2016; and (3) any evidence seized from the two cell phones.

The Court will begin its analysis by focusing on the search of the DD clubhouse on May 13, 2016.

**Memorandum Decision & Order – page 11**

## CONCLUSIONS OF LAW

### Clubhouse Search

The Government seeks to justify the warrantless search of the clubhouse on the ground that Thomas was residing there and had waived his Fourth Amendment rights to a search of his residence. The Fourth Amendment is not violated by a warrantless search authorized by parole conditions so long as the officer has (1) a reasonable suspicion of wrongdoing (*U.S. v. Knights,* 534 U.S. 112 (2001) and (2) probable cause that the home searched is in fact the residence of the parolee (*U.S. v. Grandberry,* 730 F.3d 968 (9th Cir. 2013).

### Reasonable Suspicion of Wrongdoing

The first requirement is easily satisfied here. One of Thomas's parole conditions – imposed by the Commission – was that he "abstain completely from the . . . use . . . of narcotics or controlled substances." *See Commission Conditions (Dkt. No. 19-2).* PO Geisel knew that Thomas had struggled with methamphetamine use while on parole, and knew what Thomas looked like, and how he acted, when he was using the drug. At the clubhouse, Thomas displayed those same characteristics, leading PO Geisel to conclude that he was using methamphetamine. His behavior included an inability to focus on a specific subject during a conversation, and his physical appearance included weight loss, dry mouth, and pock marks on a visibly collapsed face. These physical and behavioral

traits, combined with PO Geisel's historical knowledge of Thomas, created a reasonable suspicion that Thomas was violating the terms of his parole.[3]

**Probable Cause that Thomas was residing in the Clubhouse**

The next issue is whether PO Geisel had probable cause to believe that Thomas was residing in the clubhouse. Probable cause "exists if an officer of reasonable caution would believe, based on the totality of the circumstances, that the parolee lives at a particular residence." *Grandberry,* 730 F.3d at 975-76. This is a "relatively stringent" standard, which requires more than "a mere well-founded suspicion." *Id.* at 976. "There must be strong evidence" that the parolee resides at the address. *Id.*

In implementing this standard, certain patterns emerge in the case law supporting a finding of probable cause that a particular location is the parolee's residence: (1) "the parolee did not appear to be residing at any address other than the one searched"; (2) "the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base"; (3) "the parolee had a key to the residence in question"; and (4) "either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee." *Id.* These factors are viewed cumulatively rather than independently for purposes of assessing probable cause as to a residence. *Id.* Although the ultimate question whether probable cause exists is "fact-intensive," and cannot be answered by cross-checking a list of factors, these factors

---

[3] The Court did not include in this analysis the statement made by Thomas at the clubhouse on May 13th that he had used methamphetamine that day. The Court has concerns that Thomas was in custody at the time he made that statement and had not been read his *Miranda* warning. But that issue need not be resolved now because reasonable suspicion exists even without the statement.

guide the Court's application of the probable cause standard to the facts known by the Officers.

In this case, PO Geisel relied on the following facts to conclude that Thomas resided at the clubhouse: (1) He had visited the Ten Lane address twice but seen no evidence that Thomas resided there; (2) He had information from Task Force Officer Ostrander that Thomas was spending a lot time recently at the clubhouse and possibly living there; (3) The gold Ford Expedition, camper, white trailer, and dog were all located at the clubhouse; and (4) While Thomas did not appear to have a key to the clubhouse, he was President of the DD and his interactions with the lessee Quick showed that Quick was deferring to Thomas on questions of who should enter.

The Court cannot find that these reasons add up to probable cause. The presence of the Expedition, camper, and trailer at the clubhouse could simply mean that Thomas needed to store them there because of limited space at the Ten Lane address. Indeed, PO Geisel conceded during his testimony that there was no room at the Ten Lane address for the white trailer. So the absence of these large items at Ten Lane with its smaller area, and their presence at the clubhouse with its larger area, was hardly surprising and is scant evidence that Thomas was actually residing at the clubhouse. Nothing of substance is added by the knowledge that Thomas was spending a lot of time recently at the clubhouse. The Ninth Circuit in *Grandberry* stressed that a line of cases "distinguish between evidence that a parolee had visited a particular residence and evidence that he lived there." *Id.* at 978.

Moreover, the Officers investigation of Thomas's residence was, like the investigation in *Grandberry,* "perfunctory." *Id.* at 978. PO Geisel did not ask Thomas's wife where he resided, and made no effort to surveil the Ten Lane house or to ask neighbors for information. He testified that he did not know the source of Officer Ostrander's tip that Thomas was spending a lot of time at the clubhouse and possibly residing there, so he had no idea whether that tip was reliable. When property manager James Howard told the Officers that Thomas did not live at the clubhouse, the Officers failed to follow up and ask him how he arrived at that conclusion. The bottom line is that PO Geisel did not have the "strong" facts that would satisfy the "stringent" test for finding probable cause to believe Thomas was residing at the clubhouse.

This conclusion is confirmed by PO Geisel's testimony at the evidentiary hearing. In response to one question about whether he believed that Thomas was residing in the clubhouse, PO Geisel testified that "I had my suspicions, yes." *See Transcript (Dkt. No. 49)* at p. 151. At another point, he testified that "the thought crossed my mind" that Thomas "could be residing in this area." *Id.* at p. 122. A warrantless entry cannot be justified "in what *might have been* the parolee's residence." *Cuevas v. De Roco,* 531 F.3d 726, 732 (9th Cir.2008) (emphasis supplied). PO Geisel's statements confirm the results of an objective evaluation of the evidence: The record does not contain "strong" facts to meet the "stringent" test for finding probable cause.

The Government argues that the "stringent" standard of probable cause should be relaxed when the location searched is not a home or apartment where there is a legitimate concern for the privacy of other residents. The Government cites a footnote in

**Memorandum Decision & Order – page 15**

*Grandberry* stating that "this case does not present the question whether the search of non-residential real 'property' 'under' a parolee's 'control,' such as a storefront or warehouse, could be justified under the terms of this search condition." *Grandberry,* 730 F.3d at 982 n. 14. The Government reads this comment to imply that a different standard should apply if the parole search was conducted in a commercial building, and argues that the clubhouse should be treated the same way. The footnote appears to relate to an earlier decision that mentioned in passing that a more relaxed standard might apply if there was "no concern" about the rights of any others that might be residing in the location searched. *U.S. v. Franklin,* 603 F.3d 652, 657 (9th Cir. 2010) (finding probable cause that parolee resided in motel room where (1) desk clerk verified that parolee paid for the room, (2) a credible tip confirmed that he resided there, and (3) the police heard the parolee's voice inside the motel room ).

However, neither *Franklin* nor *Grandberry* hold that the probable cause standard is relaxed when the location searched is akin to a warehouse. The Government cites no case so holding. But it does not matter because the clubhouse was not a public space akin to a "storefront," an empty space akin to a "warehouse," or a location exclusively occupied by the parolee like a motel room. To a much greater extent than these three examples, a clubhouse would engender an expectation of privacy in its occupants because only they are allowed entry. The whole purpose of the clubhouse is to have a communal gathering place where non-members are excluded and members enjoy privacy. It cannot be said – like it could be said of a storefront, warehouse or motel room – that there was "no concern" about the privacy rights of others if the police barged in for an

**Memorandum Decision & Order – page 16**

unannounced search. The Court therefore rejects the Government's argument that a more relaxed standard for probable cause applies to this case.

**<u>Controlling Authority</u>**

The Government argues, however, that Thomas waived his Fourth Amendment rights not only to a search of his residence, but also to a search of any "structure . . . for which [he] is the controlling authority." This expansion of the Fourth Amendment waiver was not imposed by the Commission but instead was imposed by the Board. This raises the issue whether the Board had the authority to expand the Fourth Amendment waiver imposed by the Commission.

Under Idaho Code § 20-223, "the Commission has sole power to determine eligibility for parole." *Mellinger v. Idaho Dept. of Corrections,* 757 P.2d 1213, 1219 (Id.Ct.App. 2007). Pursuant to that authority, only the Commission may impose "substantive, rehabilitative conditions of parole." *Id.* The Board has the power to "recommend substantive conditions, but it may only impose supervisory conditions." *Id.*

The difference between substantive and supervisory conditions was explained by the Idaho courts in two cases: *Mellinger* and *State of Idaho v. Santana,* 2017 WL 875974 (Id.Ct.App. March 6, 2017*).* In *Mellinger,* the court held as substantive an intensive program imposed by the Board requiring, among other things, that the parolee not use alcohol and be subject to frequent unannounced testing for alcohol and drugs. *Mellinger,* 757 P.2d at 1218-19. In *Santana*, the court held that a Fourth Amendment waiver was a substantive condition that could not be imposed by the Board if it was not imposed by the Commission in the first instance. *Santana, supra,* at *3. To illustrate the scope of its

**Memorandum Decision & Order – page 17**

holding, the court offered an example: While the Commission could order drug testing, the Board could "then set forth the time and place the drug tests would be conducted; however, it could not expand the condition to include a search of the probationer's vehicle at the time of the drug test." *Id.*

In this case the Board expanded the scope of the Fourth Amendment waiver originally set by the Commission. According to *Mellinger* and *Santana*, such an expansion is a substantive rather than a supervisory condition, and the Board acted beyond its authority in imposing such a condition. Thus, the Court holds that the search of the clubhouse cannot be justified on the basis of the "controlling authority" language in the Board's parole conditions.

**Consent**

The Government responds, however, that it had the consent of Quick, the lessee, to enter the clubhouse. The Government points out that Quick stated to the Officers that although he did not have a key, the Officers could either kick the door in or pick the lock. But this "consent" was not voluntarily given. The Officers repeatedly told Quick that Thomas would be going to jail unless they got entry to the clubhouse. At the same time, it was clear that Thomas – as the President of the DD – was the controlling authority because the video shows Quick deferring to Thomas as the Officers sought entry; Quick would not consent so long as Thomas did not consent. It was only when Thomas relented, after repeated threats that he would go to jail otherwise, that Quick told the Officers they could kick down the door or pick the lock. Those circumstances do not describe a voluntary consent, and hence the Court rejects the Government's argument.

**Memorandum Decision & Order – page 18**

**Conclusion on Clubhouse Search**

Being unable to satisfy any of the exceptions to the warrant requirement, the Government's warrantless search of the DD clubhouse on May 13, 2016, violated Thomas's Fourth Amendment rights. Consequently, the Court will order excluded from evidence the firearm and drugs seized during the search on May 13, 2017.

**Cell Phones**

To search the cell phones, Task Force Officer Ostrander obtained a search warrant containing statements that the search of the clubhouse on May 13, 2016, uncovered proof that Thomas was living there and had possession of a firearm and drugs. *See Search Warrant Affidavit (Dkt. No. 27), Exhibit V*. The exclusionary rule extends to evidence when there is "a causal connection between the illegal conduct and the evidence sought to be suppressed." *U.S. v. Crawford*, 372 F.3d 1048, 1054 (9th Cir.2004) (en banc). Officer Ostrander used the evidence seized in the illegal search to obtain the search warrant for the cell phones. There is, therefore, a causal connection between the illegal conduct and the evidence sought to be suppressed. In other words, the contents of the cell phones are fruit of the poisonous tree and must be suppressed. Hence that information must be excluded.

**Statements of May 16, 2016, and May 27, 2016**

Similarly, these incriminating statements are completely intertwined with the illegal clubhouse search. Hence they must also be excluded as fruit of the poisonous tree.

**Conclusion**

For all the reasons expressed above, the Court will grant the motion to suppress.[4]

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to suppress (docket no. 19) is GRANTED, and that the following are excluded from evidence: (1) the firearm, drugs, and other items seized during the search at 204 West Main Street in Caldwell, Idaho on May 13, 2016; (2) incriminating statements made by Thomas on May 16, 2016, and May 27, 2016; and (3) information obtained from the two cell phones seized on May 13, 2016, from Thomas.

IT IS FURTHER ORDERED, that the motion to quash and for protective order (docket no. 45) is DEEMED MOOT.

DATED: May 1, 2017

_____
B. Lynn Winmill
Chief Judge
United States District Court

---

[4] The Court has significant concerns about the dual role played by PO Geisel as he balanced his rehabilitative role as a Parole Officer with his criminal investigator role as a Task Force Officer. He describes the search of the clubhouse as entirely related to this role as Parole Officer, but a simple review of the Findings of Fact set forth above shows that it was primarily related to the Task Force investigation of the DD. Nevertheless, the Court recognizes that the "stalking horse" doctrine was eviscerated by the Supreme Court. *See Knights,* 122 U.S. at 122 (holding that "there is no basis for examining . . . the actual motivations of individual officers"). At any rate, the Court did not pursue this line of analysis because granting the motion to suppress was clearly dictated on other grounds.

**Memorandum Decision & Order – page 20**